FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

2016 MAR 29 P 1:10

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

ELIDA RIVAS and
DELIA GUTIERREZ

Plaintiffs,

v.

SALDIVAR & ASSOCIATES, INC.

a Virginia corporation,

d/b/a/ R&R CATERING

Serve: Robert P. Saldivar
Registered Agent
8004-A Alban Rd.
Springfield, VA 22150

ROBERT P. SALDIVAR, MICHELLE M. BLOXTON, and MANUEL CHAVEZ

Defendants

JURY TRIAL DEMANDED

Civ. No: 1:16cv343
LMB/JFA

# COMPLAINT

## Preliminary Statement

1. Plaintiffs Elida Rivas and Delia Gutierrez bring this suit against their former employers: Saldivar & Associates, Inc., doing business as R&R Catering, and certain of its directors, officers, and employees.

2. Plaintiffs' claims arise from Defendants' failure to pay minimum and overtime wages as required by Fair Labor Standards Act, 29 U.S.C. §§ 201–219, (FLSA), and for breach of their employment contracts under Virginia common law.

3. The Court has subject-matter jurisdiction over the FLSA claims pursuant to 29 U.S.C. § 216(b) (private right of action) and 28 U.S.C. § 1331 (federal question). The court has subject-matter jurisdiction over the state-law breach-of-contract claims because they are so closely related to the federal-law claims as to form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

4. The Court has personal jurisdiction over Defendants because all Defendants are domiciled in or regularly work in the Eastern District of Virginia, and because the work at issue was performed at Defendants' business in the Eastern District. Venue is proper in this court for the same reason. *See* 28 U.S.C. § 1391(b)(1)–(2).

**PARTIES**

2. Plaintiffs are adult residents of Fairfax County, Virginia. They worked as food preparation workers in the "cold kitchen" of R&R Catering in Springfield, Virginia, preparing foods to be served at R&R-catered events in Northern Virginia and the District of Columbia.

3. Defendant Saldivar & Associates, Inc., doing business as R&R Catering, ("R&R Catering" or "R&R") is a Virginia corporation. Its principal office is located at 7956 Cameron Brown Court, Springfield, VA 22153. Its registered office is at 8004-A Alban Road, Springfield, VA 22150.

4. Defendant Robert P. Saldivar is the President and Treasurer of R&R Catering, and is also one of R&R's directors. Upon information and belief, he is a resident of Fairfax County, Virginia.

5. Defendant Michelle M. Bloxton is the Vice-President and Secretary of R&R Catering, and is also one of R&R's directors. Upon information and belief, she is a resident of Prince William County, Virginia.

6. Upon information and belief, Defendants Saldivar and Bloxton are owners of R&R.

7. Defendant Manuel Chavez has worked for R&R since 1999. Upon information and belief, Defendant Chavez became R&R Catering's corporate chef starting in late 2013 or early 2014, and remained in that position for the remainder of Plaintiffs' employment at R&R. Defendant Chavez's place of residence is unknown. Upon information and belief, he regularly works in Fairfax County and Prince William County.

## FACTS

### R&R Catering

8. R&R Catering is a catering company in Springfield, Virginia and has been in existence since around 1989. The company caters events in Northern Virginia and the District of Columbia.

9. Upon information and belief, the gross annual business volume of R&R Catering exceeded $500,000 at all relevant times.

10. During Plaintiffs' employment, R&R Catering maintained at its registered address a "hot kitchen," a "cold kitchen," and a suite of offices. Defendants Saldivar, Bloxton, and Chavez each had their own office. At least two members of the accounting staff also had their own offices: Michelle Kalski, who worked as an accountant, and a woman named "Tanya" who

was frequently the person who handed out workers' paychecks and who, upon information and belief, had some accounting duties as well.

11. R&R also maintained a warehouse with catering supplies, located about a three or four-minutes' drive from the office and kitchens.

**Plaintiffs' Work Generally**

12. Plaintiff Elida Rivas first worked for R&R as a temporary worker during the December 2010 holiday season. She left at the end of December when the temporary job ended, then was rehired as a regular employee around April of 2011. Plaintiff Rivas worked for Defendants from approximately April 2011 to July 17, 2015.

13. Plaintiff Delia Gutierrez first worked for R&R as a temporary worker during the December 2012 holiday season. She left at the end of December when the temporary job ended, then was rehired as a regular employee around March of 2013. Plaintiff Gutierrez worked for Defendants from approximately March 2013 to December 4, 2015.

14. When Plaintiffs were rehired as regular employees, their regular pay rate was $9.00 per hour. Around September 10, 2014 their regular rate rose to $11.00 per hour.

15. Plaintiffs worked in R&R's "cold kitchen," preparing platters of cold foods for R&R-catered events in Virginia and the District of Columbia. This included cutting up cheeses, fruits, and vegetables; preparing sandwiches; and making desserts. The workers arranged these cold foods on platters, covered them in plastic wrap, put a number or event label on the platter, and stored the platters until they were needed for the event.

16. Upon information and belief, in the performance of their jobs, Plaintiffs regularly prepared foodstuffs that they then placed into interstate commerce, or that were placed into interstate commerce by others.

17. Plaintiffs did not have a predictable work schedule. The days they worked each week and the hours they worked each day varied substantially—no two weeks were alike. Plaintiffs typically clocked in to work in the early morning, often as early as 6:00 am., but their clock-out time fluctuated significantly from day to day. Plaintiffs were often given a half-hour off-the-clock break period each day for lunch, but Plaintiffs were frequently not able to take their break. Plaintiffs received no other breaks.

18. Defendants used two systems to keep track of cold-kitchen workers' hours, including those of Plaintiffs. One was a mechanized punch-clock system; cold-kitchen workers were given two personalized "keys": a green one to punch in, and a red one to punch out. The other method was a ledger that was kept next to the punch-clock. Each day, the cold-kitchen workers, including Plaintiffs, would write their name and their clock-in and clock-out times by hand. Both the punch-clock and the ledger were kept in the cold kitchen near the door.

19. Plaintiffs kept their own daily, contemporaneous records of the start and end time of each workday, in small notebooks. They did this on the advice of their co-workers, who told Plaintiffs that the company's paychecks regularly failed to compensate workers for all of the hours they worked in a pay period.

**Supervision**

20. At the time Plaintiffs were hired, the cold-kitchen supervisor was a woman named Marlene Barrantes.

21. In late 2013 or early 2014, Ms. Barrantes left R&R and Defendant Manuel Chavez took over supervision of the cold kitchen.

22. Defendant Chavez worked as the executive chef of R&R Catering, and in that position was hired to oversee all culinary branches of the company. Among other duties, Defendant Chavez was put in charge of both the hot and cold kitchens, as well as deliveries and inventory for the company.

23. As the cold-kitchen supervisor, Defendant Chavez set Plaintiffs' work schedules each week, assigned them their daily tasks on a day-by-day and hour-by-hour basis, and supervised their work.

24. Defendant Chavez assigned Plaintiffs their daily tasks based on the list of foods to be prepared that day. Office staff prepared this list each day, and Defendant Chavez would pick it up and bring it to the cold kitchen.

25. Defendant Chavez had the power to discipline workers, including the power to dock their pay or their hours. On one occasion, Defendant Chavez took Plaintiff Rivas off of the cold-kitchen schedule from July 7–10, 2015 as a punishment for supposedly having taken the July 4, 2015 holiday off of work without permission.

26. Defendant Chavez had the power to fire workers. He used this power on multiple occasions during Plaintiffs' tenure at R&R, firing workers in order to save on labor costs, or because he lost his temper and fired them on the spot. Defendant Chavez steadily decreased the size

of the cold-kitchen staff from around eight or nine workers to as few as two or three. By late 2014, Plaintiffs were the only or among the only workers remaining in the cold kitchen.

27. Defendant Chavez required the cold-kitchen workers to purchase uniforms from him. These were black shirts with the company logo on them. He charged workers $25 per shirt, and Plaintiffs each bought four of them.

28. When Plaintiffs ran out of necessary supplies, Defendant Chavez is the person whom they would advise. If Defendant Chavez was not available, Plaintiffs would advise Defendant Robert Saldivar.

**Pay Practices and Pay Problems**

29. R&R calculated its work-week on a Wednesday-to-Tuesday basis.

30. Payday was supposed to be every other Friday. In practice, however, payday was so irregular that Plaintiffs often did not know when they could expect to get their pay. Plaintiffs had to go to the office and ask "Tanya" the accountant if any paychecks had arrived. Plaintiffs sometimes had to wait as long as 22 days or a month between paychecks.

31. On multiple occasions, Defendant Chavez told Tanya not to give a particular cold-kitchen worker her paycheck if she went to retrieve it, because he was mad at the worker.

32. Plaintiffs were supposed to receive two "Employee Work Time/Off-Clock Summaries" with each of their paychecks, showing Plaintiffs' hours of work each day as recorded by the punch-clock. However, Defendants sometimes failed to give Plaintiffs these summaries, or they would contain errors. Defendants also frequently made handwritten changes to the summaries that reduced Plaintiffs' hours. For example, Defendants frequently claimed that

Plaintiffs had taken a half-hour off-the-clock break period even where Defendants' own punch-clock showed that Plaintiffs did not take a break that day.

33. Defendants sometimes paid Plaintiffs in one pay period for hours that they had in fact worked in a different pay period.

34. These pay practices made it difficult for Plaintiffs to determine whether they were in fact being properly compensated for the work they were doing.

35. Even on the days when Plaintiffs received paychecks, there was no guarantee that they would be able to cash them. At times, Tanya would give Plaintiffs their checks, but with the caveat that Plaintiffs could not cash them until sometime the following week.

36. Plaintiffs' paychecks regularly failed to compensate Plaintiffs for all of the regular and overtime hours they worked in a given pay period, whether on the clock or off the clock. These violations occurred in at least three ways:

    a. Defendants regularly failed to pay Plaintiffs' wages for the work they performed at R&R. Sometimes Plaintiffs' paychecks were missing hours. Other times, Defendants simply failed to pay Plaintiffs any wages at all for the work they performed, in amounts ranging from isolated days to entire weeks. These violations include, but are not limited to, the following:

        i. Plaintiff Rivas was not paid any wages for the hundreds of hours of work she performed from March 1–April 30, 2014; from November 19, 2014–January 13, 2015; or from July 1–17, 2015. She was also not paid any wages for various days and hours outside of these periods.

  ii. Plaintiff Gutierrez was not paid for the hundreds of hours of work she performed from March 7–April 22, 2014; November 19, 2014–January 13, 2015; or from November 4, 2015–December 1, 2015. She was also not paid any wages for various days and hours outside of these periods.

b. Defendant Chavez regularly required workers to work off-the-clock during their half-hour lunch breaks. This occurred approximately two days each week, often on the weekends.

c. Defendants' records show that they calculated Plaintiffs' weekly hours incorrectly, by treating certain minutes that Plaintiffs worked as constituting mere 1/100ths of an hour, rather than 1/60ths. Defendants usually (but not always) gave Plaintiffs two "Work Time/Off-Clock Summaries" with each paycheck, showing the worker's time each week as recorded by the punch-clock. Handwritten notes on these Summaries reveal Defendants' incorrect calculations. For example, during the week of June 17–23, 2015, Defendants' Summary shows Plaintiff Gutierrez as having worked 62 hours and 42 minutes. During the second week of that pay period, June 24–June 30, 2015, the Summary shows her having worked 51 hours and 32 minutes. Defendants simply added up 62:42 and 51:32 and found that plaintiff had worked 113 hours and "74 minutes." An hour has sixty minutes, so 74 minutes is 1.23 hours: By Defendants' own reckoning, then, Plaintiff Rivas should have been paid for 114.23 hours. But Defendants' handwritten notes show that they incorrectly treated these 74 minutes as 0.74 *hours*, i.e. mere 1/100ths of an hour. And so Plaintiff Gutierrez was compensated for only 113.74 hours in that pay period. Plaintiffs' paystubs—including Plaintiff

Gutierrez's paystub for the pay period in this example—confirm that Defendants' handwritten errors were in fact carried over into Plaintiffs' take-home pay. Upon information and belief, this violation occurred in every pay period during Plaintiffs' employment, or at least more often than not.

37. Plaintiffs complained to R&R personnel about their pay problems, often complaining first to Defendant Chavez because he spoke both Spanish and English.

38. When Plaintiffs noticed that their checks were missing hours, they would usually complain to Defendant Chavez or accountant Michelle Kalski. Defendant Chavez and Ms. Kalski would tell Plaintiffs that they would add these unpaid hours to Plaintiffs' next paychecks, but this would not actually happen.

39. When Plaintiffs simply did not receive checks at all, they complained to Tanya in the administrative office. Tanya would tell Plaintiffs that the company did not have the money to pay their wages.

40. On at least two occasions, Plaintiffs stopped working at R&R for a few days because they were frustrated by the company's constant pay problems.

41. On or about January 23, 2015, after having received no pay for half of November, all of December, and half of January, Plaintiffs told Defendant Chavez that they intended to quit. By this time, they were the only experienced cold-kitchen workers left at R&R.

42. Shortly after Plaintiffs threatened to quit, Defendant Robert Saldivar held a meeting with Plaintiffs, either in the cold kitchen or in an adjacent part of the building that housed a Mexican restaurant called "Poncho's," another of Defendants' business ventures. A worker

named "Haydee" served as a translator at this meeting. Defendant Saldivar asked Plaintiffs not to quit and told the workers that they would be paid their back wages.

43. On or around January 26, 2015, Defendant Michelle Bloxton sent Plaintiff Gutierrez a text message urging her to come back to work, and Plaintiffs did so.

44. On or around January 27, 2015, Defendants gave each Plaintiff a check for $1,500, drawn on the account of "StadiYum Cuisine, LLC."

45. On or around February 11, 2015, Defendants paid each Plaintiff $1,000 in cash.

46. On or around February 15, 2015, Defendants paid each Plaintiff $750 in cash.

47. These three payments were intended to induce Plaintiffs not to quit.

48. Some time after Plaintiffs received this second cash payment, Plaintiffs were told to come to the office. Accountant Michelle Kalski gave each Plaintiff a handwritten statement of the unpaid wages that Defendants admitted they owed.

49. Plaintiff Rivas's statement said that she had been owed $4,172.38 in unpaid wages, that Defendants had made the three payments totaling $3,250 as described above, and that Plaintiff Rivas was still owed $922.38 in back wages.

50. Plaintiff Gutierrez's statement said that she had been owed $4,231.32 in unpaid wages, that Defendants had made the three payments totaling $3,250 as described above, and that Plaintiff Gutierrez was still owed $981.32 in back wages.

51. Defendants' pay violations did not end there, and Plaintiffs continued to accrue unpaid wages. Accountant Michelle Kalksi again gave Plaintiffs statements—this time typed rather than handwritten—again admitting certain back wages Plaintiffs were owed.

52. Plaintiff Rivas's statement showed that she was owed $5,867.69 in back wages, including her previous unpaid-wage balance of $922.38 from the previous statement.

53. Plaintiff Gutierrez's statement showed that she was owed $5,867.69 in unpaid wages, including her previous balance of $981.32 from the previous statement.

54. These statements had no dates on them and were unaccompanied by Employee Work Time/Off-Clock Summaries.

55. Plaintiffs believe that Defendants' statements are incorrect and significantly understate Plaintiffs' unpaid wages.

**End of Plaintiff Rivas's Employment**

56. By July 2015, Plaintiffs' back wages were still due and owing. Plaintiff Rivas complained about this to Defendant Chavez, who told her to talk to Tanya the accountant. Plaintiff Rivas brought her husband—who speaks some English—with her to Tanya's office to ask about her back wages. Tanya told Plaintiff Rivas and her husband that Plaintiff Rivas would be paid her back wages, but that the company didn't have the money to do so at this time.

57. Plaintiff Rivas then called Defendant Saldivar to ask for the money she was owed. Defendant Saldivar said that he was sorry, but he had talked to Tanya and the company did not have the money to pay her back wages right now.

58. In mid-July 2015, Plaintiffs again told Defendant Manuel Chavez that they intended to quit, due to the back wages and other pay problems at R&R.

59. Once again, shortly after Plaintiffs threatened to quit, Defendant Robert Saldivar met with Plaintiffs at the worksite, asked them not to quit, and told them that they would be paid their back wages.

60. On July 17, 2015, Plaintiffs stopped working at R&R, leaving Defendants without any experienced cold-kitchen workers.

61. Defendant Chavez attempted to convince Plaintiffs to return to work. He told Plaintiff Rivas that she was free to leave, but that it would mean that she would not receive her back wages, because he would not advocate with the office staff for her to get her back pay, and that she would have to take the matter up with Defendant Saldivar without Defendant Chavez's help.

62. Plaintiff Rivas did not return to work at R&R. Her last day was July 17, 2015.

63. Around the time Plaintiff Rivas left R&R for good, her husband went to the office a second time to ask about Plaintiff Rivas's back wages. He spoke with Tanya the accountant, who said to check back with her on Tuesday.

64. On or around Tuesday, July 28, 2015, Plaintiff Rivas's husband sent Tanya an email asking for the balance of Plaintiff Rivas's back wages.

65. About two or three days later, Tanya replied to the email, stating that Defendants owed Plaintiff Rivas $6,451.10 in unpaid wages: $3,251.71 in regular wages, $2,277.01 in overtime wages, and $922.38 in wages that were not labeled as regular or overtime. The email did not indicate the date or dates that these unpaid wages were accrued, and it included no Employee Work Time/Off-Clock Summary.

66. Plaintiff Rivas believes that Defendants' statements are incorrect and significantly understate her unpaid wages.

67. Tanya's email said that Plaintiff Rivas could pick up her check on Friday.

68. When Plaintiff Rivas went to the office to pick up her check, there was no check.

69. Plaintiff Rivas subsequently contacted Defendant Saldivar by text message to demand her back wages. She did this at least three times: on or around September 6, September 22, and October 28, 2015. Defendant Saldivar replied to the October 28 message that same day, asking who was texting him, and Plaintiff Rivas identified herself. Defendant Saldivar never texted her back.

70. Plaintiff Rivas's unpaid wages are still due and owing.

**End of Plaintiff Gutierrez's Employment**

71. When Plaintiffs stopped working in mid-July, 2015, Defendant Chavez called Plaintiff Gutierrez and urged her to come back to R&R, which she did on or around July 24, 2015.

72. On or around July 28, 2015, R&R Staff Accountant Michelle Kalski sent Plaintiff Gutierrez an email admitting that she was owed $5,867.70 in unpaid wages: $2,750.11 in regular wages, $2,136.27 in overtime wages, and $981.32 in wages that were not labeled as regular or overtime. The email did not indicate the date or dates that these unpaid wages were accrued.

73. Plaintiff Gutierrez believes that Defendants' statements are incorrect and significantly understate her unpaid wages.

74. After Plaintiff Gutierrez returned to work, R&R hired three new workers to work in the cold kitchen. As Plaintiff Gutierrez was now the only experienced cold-kitchen worker at R&R, it fell to her to show them the ropes. There was no conversation with R&R management about this, and she received no extra compensation for her work; she simply did it out of necessity. Defendants were the ones who hired these three workers, set their schedules, established their pay rates, and retained the sole power to fire or otherwise discipline them.

75. Plaintiff Gutierrez continued to work at R&R through the beginning of December 2015. The pay problems continued unabated. On or about December 4, 2015, Plaintiff Gutierrez told Defendant Chavez that she was at the point of leaving. Defendant Chavez urged her not to leave. He said that he would suggest to the office staff that they could pay her back wages incrementally in each of her next several paychecks. Defendant Chavez said that if Plaintiff Gutierrez left, he doubted that she would get paid any of her back wages at all. He told her not to bother suing for her back wages, because many people had sued the company, and nothing would happen.

76. Plaintiff Gutierrez's last day at R&R was December 4, 2015.

77. On or around December 23, 2015, the company gave Plaintiff Gutierrez a check for $981.32 in back wages. The check stub showed that the wages from this check were meant to compensate her for work she had performed from April 23–May 6, 2014—over a year-and-a-half earlier—and that Defendants had yet again calculated the overtime incorrectly.

78. In or around February 2016, Plaintiff Gutierrez received two additional checks: one for $351.78 and one for $876.81. These checks fail to cover the balance of Plaintiff Gutierrez's back wages.

79. Plaintiff Gutierrez's unpaid wages are still due and owing.

**FAIR LABOR STANDARDS ACT CLAIMS**

80. At all times relevant to this action:

a. Plaintiffs were Defendants' "employees" within the meaning of 29 U.S.C. § 203(e)(1);

b. Defendants were Plaintiffs' "employers" within the meaning of 29 U.S.C. § 203(d);

c. Defendants "employed" Plaintiffs within the meaning of 29 U.S.C. § 203(g); and

d. Plaintiffs were engaged in commerce, or were employed by Defendants in an enterprise engaged in commerce, within the meaning of 29 U.S.C. § 203(b).

**Claim 1:**

**Willful Failure to Pay Minimum Wages**
**29 U.S.C. § 206**

81. Defendants were required to pay Plaintiffs at least $7.25 for each hour that they worked at R&R Catering.

82. Defendants regularly failed to pay Plaintiffs any wages at all, sometimes for weeks or months at a time.

83. These violations were "willful" within the meaning of the FLSA, 29 U.S.C. § 255(a), because they were flagrant and obvious.

**Claim 2:**

**Willful Failure to Pay Overtime Compensation**
**29 U.S.C. § 207**

84. Defendants regularly failed to compensate Plaintiffs at the rate of one-and-a-half times their regular rate for the hours that they worked beyond 40 in a given week.

85. By failing to pay Plaintiffs the hourly time-and-a-half overtime premium, defendants violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207.

86. This violation was "willful" within the meaning of the FLSA, 29 U.S.C. § 255(a), in that Defendants knew or should have known that Plaintiffs were working overtime but failed to compensate them appropriately. Defendants admitted to Plaintiffs in writing that they owed Plaintiffs substantial back wages, including overtime wages.

**Claim 3:**

**Breach of Contract**
**(Against Defendant Saldivar & Associates, Inc. Only)**

87. Each Plaintiff reached an agreement with Defendant Saldivar & Associates, Inc. whereby the Plaintiff would perform food-preparation work for the company in exchange for an hourly wage.

88. Employment contracts were thus formed under Virginia law.

89. The company failed to pay Plaintiffs for all the work they performed, breaching the contracts.

90. As a result of the company's breaches, Plaintiffs suffered damages.

**RELIEF REQUESTED**

Wherefore, Plaintiffs respectfully request that this Court grant them the following relief:

1. Declare that Defendants' FLSA violations were willful, such that a three-year statute of limitations applies.

2. Award each Plaintiff her actual damages under the FLSA in the amount of all unpaid minimum and overtime wages, jointly and severally against all Defendants, in an amount to be proved at trial;

3. Award each Plaintiff an additional amount of liquidated damages equal to Plaintiffs' unpaid FLSA minimum wages and overtime, jointly and severally against all Defendants, pursuant to 29 U.S.C.§ 216(b);

4. Award Plaintiffs their costs and reasonable attorney's fees, jointly and severally against all Defendants, pursuant to 29 U.S.C. § 216(b);

5. Award each Plaintiff her contract damages under Virginia law against Defendant Saldivar & Associates, Inc.; and
6. Any other relief that the Court deems just and proper.

Plaintiffs demand trial by jury.

Respectfully submitted,

Date: March 29, 2016

Nicholas Cooper Marritz (VSB No. 89875)
Simon Y. Sandoval-Moshenberg (VSB No. 77110)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, Virginia 22041
Tel: (703) 778-3450 x 607
Fax: (703) 778-3454
nicholas@justice4all.org
*Counsel for Plaintiffs*