UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| ELIDA RIVAS and<br>DELIA GUTIERREZ<br><br>*Plaintiffs*,<br><br>v.<br><br>SALDIVAR & ASSOCIATES, INC.<br>*et al.*,<br><br>*Defendants* | Case No: 1:16-cv-343-LMB-JFA<br><br>Hearing Date: July 22, 2016<br>10:00 a.m. |

**Declaration of Elida Rivas**

1. My name is Elida Rivas. I am over 18 years of age and am competent to make this declaration based on my personal knowledge. I am a resident of Fairfax County.

2. I first worked for R&R Catering as a temporary worker during the December 2010 holiday season. I left at the end of December 2010 when the temporary job ended, then I was rehired as a regular employee around April of 2011. I then worked for R&R from approximately April 2011 to July 17, 2015.

3. During the time I worked at R&R, the company was located at 8004-A Alban Road, Springfield, Virginia 22150. The building had a "hot kitchen," a "cold kitchen," and a suite of offices. Defendants Robert Saldivar, Michelle Bloxton, and Manuel Chavez each had their own office. At least two members of the accounting staff also had their own offices: Michelle

1



Kalski, who worked as an accountant, and a woman named "Tanya" who was frequently the person who handed out workers' paychecks and who I understand had some accounting duties as well.

4. R&R also had a sales team of about seven people who would work with clients to design and coordinate their catered events.

5. R&R also maintained a warehouse with catering supplies, located about a three or four-minutes' drive from the office and kitchens.

6. I was hired to work in R&R's "cold kitchen," preparing platters of cold foods for R&R-catered events. I understand that these events were held in Virginia and the District of Columbia. My work included cutting up cheeses, fruits, and vegetables; preparing sandwiches; and making desserts. I would arrange these cold foods on platters, cover them in plastic wrap, put a number or event label on the platter, and store the platters until they were needed for the event.

7. I was rehired as a regular employee at a regular pay rate of $9.00 per hour. Around September 10, 2014 my regular rate rose to $11.00 per hour. My pay rate was a flat, hourly rate; I received no bonuses, or commissions, for example, based on the number of food platters that I produced.

8. I did not have a predictable work schedule. The days I worked each week and the hours I worked each day varied substantially—no two weeks were alike. I typically clocked in to work in the early morning, often as early as 6:00 am., but my clock-out time fluctuated significantly from day to day. I was often given a half-hour off-the-clock break period each day for lunch, but I was frequently not able to take my break. I received no other breaks.

9. The company used two systems to keep track of cold-kitchen workers' hours, including my own. One was a mechanized punch-clock system; I was given two personalized "keys": a green one to punch in, and a red one to punch out. The other method was a ledger that was kept next to the punch-clock. Each day, the cold-kitchen workers, including me, would write our names and our clock-in and clock-out times by hand. Both the punch-clock and the ledger were kept in the cold kitchen near the door.

10. I also kept my own daily, contemporaneous records of the start and end time of each of my workdays. I did this on the advice of my co-workers, who told me that the company's paychecks regularly failed to compensate workers for all of the hours they worked in a pay period.

11. At the time I was hired, the cold-kitchen supervisor was a woman named Marlene Barrantes.

12. In late 2013 or early 2014, Ms. Barrantes left R&R and Defendant Manuel Chavez took over supervision of the cold kitchen.

13. Among other duties. Defendant Chavez was put in charge of both the hot and cold kitchens, as well as deliveries and inventory for the company.

14. As the cold-kitchen supervisor. Defendant Chavez set my work schedule each week, assigned me my daily tasks on a day-by-day and hour-by-hour basis, and supervised my work.

15. Defendant Chavez assigned me my daily tasks based on the list of foods to be prepared that day. Office staff prepared this list each day and posted it in the hall outside the office suite, and each day either I or my co-worker Plaintiff Delia Gutierrez would pick up this list and bring it to the cold kitchen.

16. Defendant Chavez had the power to discipline cold-kitchen workers, including the power to dock our pay or our hours. On one occasion, Defendant Chavez took me off of the cold-

kitchen schedule from July 7–10, 2015, as a punishment for supposedly having taken the July 4, 2015 holiday off of work without permission.

17. Defendant Chavez had the power to fire workers. He used this power on multiple occasions during my tenure at R&R, firing workers in order to save on labor costs, or because he lost his temper and fired them on the spot.

18. Defendant Chavez steadily decreased the size of the cold-kitchen staff from around eight or nine workers to as few as two or three. By late 2014, my co-worker Delia Gutierrez and I were the only or among the only workers remaining in the cold kitchen.

19. Defendant Chavez required me and the other cold-kitchen workers to purchase uniforms from him. These were black shirts with the company logo on them. He charged us $25 per shirt, and I bought four of them from him.

20. When I would run out of necessary supplies, Defendant Chavez is the person whom I would advise. If Defendant Chavez was not available, I would advise Defendant Robert Saldivar.

21. I understand that Defendant Robert Saldivar was the president and treasurer of R&R during the years that I worked there. I heard Defendant Manuel Chavez and others refer to him as an owner of the company, along with Defendant Michelle Bloxton. I do not know what his precise duties were, but he had his own office on the company premises where he worked every day.

22. I understand that Defendant Michelle Bloxton was the vice-president and secretary of R&R during the years that I worked there. I heard Defendant Manuel Chavez and others refer to her as an owner of the company, along with Defendant Robert Saldivar. I do not know what her precise duties were, but she had her own office on the company premises where she worked every day. One of her duties appeared to be soliciting clients and entering into

catering contracts on behalf of the company, like a member of the sales team. If we were preparing food for one of Defendant Bloxton's events, we had take extra care to make sure that everything was done just right.

23. R&R calculated its work-week on a Wednesday-to-Tuesday basis. Payday was supposed to be every other Friday. In practice, however, payday was so irregular that I often did not know when I could expect to be paid. I often had to go to the office and ask "Tanya" the accountant if any paychecks had arrived. I sometimes had to wait as long as 22 days or a month between paychecks.

24. I was supposed to receive two "Employee Work Time/Off-Clock Summaries" with each of my paychecks, showing my hours of work each day as recorded by the punch-clock. However, Defendants sometimes failed to give me these summaries, or they would contain errors. Defendants also frequently made handwritten changes to the summaries that reduced my hours. For example, Defendants frequently claimed that I had taken a half-hour off-the-clock break period even where Defendants' own punch-clock showed that I did not take a break that day. Defendants sometimes paid me in one pay period for hours that I had in fact worked in a different pay period. These pay practices made it difficult for me to determine whether I was in fact being properly compensated for the work I was doing.

25. Even on the days when I received a paycheck, there was no guarantee that I would be able to cash it. At times, Tanya would give me my check, but with the caveat that I could not cash it until sometime the following week.

26. I believe that my paychecks regularly failed to compensate me for all of the regular and overtime hours that I worked in a given pay period, whether on the clock or off the clock.

27. Defendants regularly failed to pay me any wages for the work I performed at R&R. Sometimes my paychecks were missing hours. Other times, Defendants simply failed to pay me any wages at all for the work I performed, in amounts ranging from isolated days to entire weeks.

28. I was not paid for the hundreds of hours of work I performed from March 1–April 30, 2014; November 19, 2014–January 13, 2015; or from July 1–17, 2015. I was also not paid any wages for various days and hours I worked outside of these periods.

29. Defendant Chavez regularly required me to work off-the-clock during my half-hour lunch break. This occurred approximately two days each week, often on the weekends.

30. I also understand that Defendants calculated my weekly hours incorrectly, by treating certain minutes that I worked as constituting mere 1/100ths of an hour, rather than 1/60ths. Defendants usually (but not always) gave me two "Work Time/Off-Clock Summaries" with each paycheck, showing my clock-in and clock-out time each week as recorded by the punch-clock. Handwritten notes on these Summaries reveal Defendants' incorrect calculations. I believe that this violation occurred in every pay period during my employment, or at least more often than not.

31. My co-worker—Plaintiff Delia Gutierrez—and I would complain to R&R personnel about our pay problems, often complaining first to Defendant Chavez because he spoke both Spanish and English. Our native language is Spanish.

32. When we noticed that our checks were missing hours, Plaintiff Gutierrez and I would usually complain to Defendant Chavez or accountant Michelle Kalski. Defendant Chavez and Ms. Kalski would tell us that they would add these unpaid hours to our next paychecks, but this would not actually happen.

33. On those occasions when we did not receive a paycheck at all, Plaintiff Gutierrez and I would also complain to Tanya in the administrative office. Tanya would say that the company did not have the money to pay our wages right now.

34. On at least two occasions, Plaintiff Gutierrez and I stopped working at R&R for a few days because we were frustrated by the company's constant pay problems.

35. On or about January 23, 2015, after having received no pay for half of November, all of December, and half of January, Plaintiff Gutierrez and I told Defendant Chavez that we intended to quit, and we stopped working at R&R. By this time, we were the only experienced cold-kitchen workers left at R&R.

36. Shortly after Plaintiff Rivas and I stopped working, Defendant Robert Saldivar held a meeting with us, either in the cold kitchen or in an adjacent part of the building that housed a Mexican restaurant called "Poncho's," another of Defendants' business ventures. A worker named "Haydee" served as a translator at this meeting. Defendant Saldivar asked us not to quit and told us that we would be paid our back wages.

37. Plaintiff Rivas and I also met with Defendants Michelle Bloxton and Defendant Manuel Chavez in Defendant Chavez's office, to discuss how the company was going to pay us our back wages so that we would return to work.

38. On or around January 26, 2015, Plaintiff Gutierrez and I returned to work.

39. On or around January 27, 2015, Plaintiff Gutierrez and I met with Defendants Michelle Bloxton and Manuel Chavez in Defendant Chavez's office. Defendants gave me a check for $1,500, drawn on the account of "StadiYum Cuisine, LLC."

40. On or around February 11, 2015, Plaintiff Gutierrez and I met with Defendants Michelle Bloxton and Manuel Chavez in Defendant Chavez's office. Defendants paid me $1,000 in cash.

41. On or around February 15, 2015, Plaintiff Gutierrez and I met with Defendants Michelle Bloxton and Manuel Chavez in Defendant Chavez's office. Defendants paid me $750 in cash.

42. I understood that three payments were meant to represent part of my back wages and were intended to induce me not to quit.

43. Some time after I received this second cash payment, I was told to come to accountant Michelle Kalski's office. Ms. Kalski gave me a handwritten statement of the unpaid wages that Defendants admitted they owed me. A true and correct copy of this statement is attached as Exhibit B-1.

44. Exhibit B-1 stated that I had been owed $4172.38 in unpaid wages, that Defendants had made the three payments totaling $3,250 as described above, and that I was still owed $922.38 in back wages.

45. I believe that Exhibit B-1 was incorrect and significantly understated my unpaid wages.

46. I continued to work at R&R, Defendants' pay violations also continued, and I continued to accrue unpaid wages.

47. By July 2015, my back wages were still due and owing. I complained about this to Defendant Chavez, who told me to talk to Tanya the accountant. I brought my husband, who speaks some English, with me to Tanya's office to ask about my back wages. Tanya told me and my husband that I would be paid my back wages, but that the company didn't have the money to do so at this time.

48. I then called Defendant Robert Saldivar to ask for the money I was owed. Defendant Saldivar said that he was sorry, but the company did not have the money to pay my back wages right now.

49. In mid-July 2015, Plaintiff Gutierrez and I again told Defendant Manuel Chavez that we intended to quit due to the pay problems at R&R.

50. Once again, shortly after Plaintiff Gutierrez and I threatened to quit. Defendant Saldivar met with us at the worksite, asked us not to quit, and told us that we would be paid our back wages.

51. On July 17, 2015, Plaintiff Gutierrez and I stopped working at R&R. This left Defendants without any experienced cold-kitchen workers.

52. Defendant Chavez attempted to convince me to return to work. He told me that I was free to leave, but that it would mean that I would not receive my back wages, because he would not advocate with the office staff for me to get my back pay, and that I would have to take the matter up with Defendant Robert Saldivar without Defendant Chavez's help.

53. I did not return to work at R&R. My last day was July 17, 2015.

54. Around the time that I left R&R for good, my husband went to the company office a second time to ask about my back wages. He spoke with Tanya the accountant, who said to check back with her on Tuesday.

55. On or around Tuesday, July 28, 2015, my husband sent Tanya an email asking for the balance of my back wages. A true and correct copy of this email is attached as Exhibit B-2.

56. About two or three days later, Tanya replied to the email, stating that I was owed $6,451.10 in unpaid wages: $3,251.71 in regular wages, $2,277.01 in overtime wages, and $922.38 in wages that were not labeled as regular or overtime. The email did not indicate the date or

dates that these unpaid wages were accrued, and it was unaccompanied by any Employee Work Time/Off-Clock Summaries. A true and correct copy of this email is attached as Exhibit B-3.

57. I believe that Exhibit B-3 was incorrect and significantly understated my unpaid wages.

58. Tanya's email said that I could pick up my check on Friday.

59. When I went to the office to pick up my check, there was no check.

60. I then contacted Defendant Robert Saldivar by text message to demand my back wages. I did this at least three times: on or around September 6, September 22, and October 28, 2015. Defendant Saldivar replied to the October 28 message that same day, asking who was texting him, and I identified myself. Defendant Saldivar never texted me back.

61. My unpaid wages are still due and owing.

62. The spreadsheet attached as Exhibit B-4 accurately reflects the hours I worked and the wages I was paid, to the best of my recollection.

63. During the time that I was working for R&R, I did not have other employment.

I declare under penalty of perjury that the foregoing is true and correct.

_____                              7-8-16
Elida Rivas                                                  Date

## INTERPRETER'S CERTIFICATION

I, Nicholas Cooper Marritz, certify that I am fluent in English and Spanish, and that I interpreted the foregoing Declaration of Elida Rivas to the declarant faithfully and accurately, to the best of my ability.

_____  July 8, 2016
Nicholas Marritz
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: 703-778-3450
Fax: 703-778-3454
Email: nicholas@justice4all.org