UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | |
|---|---|
| ELIDA RIVAS and<br>DELIA GUTIERREZ<br><br>*Plaintiffs*,<br><br>v.<br><br>SALDIVAR & ASSOCIATES, INC.<br>*et al.*,<br><br>*Defendants* | Case No: 1:16-cv-343-LMB-JFA<br><br><br>Hearing Date: July 22, 2016<br>10:00 a.m. |

**Declaration of Delia Gutierrez**

1. My name is Delia Gutierrez. I am over 18 years of age and am competent to make this declaration based on my personal knowledge. I am a resident of Fairfax County.

2. I first worked for R&R Catering as a temporary worker during the December 2012 holiday season. I left at the end of December 2012 when the temporary job ended, then I was rehired as a regular employee around March of 2013. I then worked for R&R from approximately March 2013 to December 4, 2015.

3. During the time I worked at R&R, the company was located at 8004-A Alban Road, Springfield, Virginia 22150. The building had a "hot kitchen," a "cold kitchen," and a suite of offices. Defendants Robert Saldivar, Michelle Bloxton, and Manuel Chavez each had their own office. At least two members of the accounting staff also had their own offices: Michelle

1



own office. At least two members of the accounting staff also had their own offices: Michelle Kalski, who worked as an accountant, and a woman named "Tanya" who was frequently the person who handed out workers' paychecks and who I understand had some accounting duties as well.

4. R&R also had a sales team of about seven people who would work with clients to design and coordinate their catered events.

5. R&R also maintained a warehouse with catering supplies, located about a three or four-minutes' drive from the office and kitchens.

6. I was hired to work in R&R's "cold kitchen," preparing platters of cold foods for R&R-catered events. I understand that these events were held in Virginia and the District of Columbia. My work included cutting up cheeses, fruits, and vegetables; preparing sandwiches; and making desserts. I would arrange these cold foods on platters, cover them in plastic wrap, put a number or event label on the platter, and store the platters until they were needed for the event.

7. I was rehired as a regular employee at a regular pay rate of $9.00 per hour. Around September 10, 2014 my regular rate rose to $11.00 per hour. My pay rate was a flat, hourly rate; I received no bonuses, or commissions, for example, based on the number of food platters that I produced.

8. I did not have a predictable work schedule. The days I worked each week and the hours I worked each day varied substantially—no two weeks were alike. I typically clocked in to work in the early morning, often as early as 6:00 am., but my clock-out time fluctuated significantly from day to day. I was often given a half-hour off-the-clock break period each day for lunch, but I was frequently not able to take my break. I received no other breaks.

9. The company used two systems to keep track of cold-kitchen workers' hours, including my own. One was a mechanized punch-clock system; I was given two personalized "keys": a green one to punch in, and a red one to punch out. The other method was a ledger that was kept next to the punch-clock. Each day, the cold-kitchen workers, including me, would write our names and our clock-in and clock-out times by hand. Both the punch-clock and the ledger were kept in the cold kitchen near the door.

10. I also kept my own daily, contemporaneous records of the start and end time of each of my workdays. I did this on the advice of my co-workers, who told me that the company's paychecks regularly failed to compensate workers for all of the hours they worked in a pay period.

11. At the time I was hired, the cold-kitchen supervisor was a woman named Marlene Barrantes.

12. In late 2013 or early 2014, Ms. Barrantes left R&R and Defendant Manuel Chavez took over supervision of the cold kitchen.

13. Among other duties. Defendant Chavez was put in charge of both the hot and cold kitchens, as well as deliveries and inventory for the company.

14. As the cold-kitchen supervisor. Defendant Chavez set my work schedule each week, assigned me my daily tasks on a day-by-day and hour-by-hour basis, and supervised my work.

15. Defendant Chavez assigned me my daily tasks based on the list of foods to be prepared that day. Office staff prepared this list each day and posted it in the hall outside the office suite, and each day either I or my co-worker Plaintiff Elida Rivas would pick up this list and bring it to the cold kitchen.

16. Defendant Chavez had the power to discipline cold-kitchen workers, including the power to dock our pay or our hours.

17. Defendant Chavez had the power to fire workers. He used this power on multiple occasions during my tenure at R&R, firing workers in order to save on labor costs, or because he lost his temper and fired them on the spot.

18. Defendant Chavez steadily decreased the size of the cold-kitchen staff from around eight or nine workers to as few as two or three. By late 2014, my co-worker Elida Rivas and I were the only or among the only workers remaining in the cold kitchen.

19. Defendant Chavez required me and the other cold-kitchen workers to purchase uniforms from him. These were black shirts with the company logo on them. He charged us $25 per shirt, and I bought four of them from him.

20. When I would run out of necessary supplies, Defendant Chavez is the person whom I would advise. If Defendant Chavez was not available, I would advise Defendant Robert Saldivar. If he was not available, I would advise Defendant Michelle Bloxton.

21. I understand that Defendant Robert Saldivar was the president and treasurer of R&R during the years that I worked there. I heard Defendant Manuel Chavez and others refer to him as an owner of the company, along with Defendant Michelle Bloxton. I do not know what his precise duties were, but he had his own office on the company premises where he worked every day.

22. I understand that Defendant Michelle Bloxton was the vice-president and secretary of R&R during the years that I worked there. I heard Defendant Manuel Chavez and others refer to her as an owner of the company, along with Defendant Robert Saldivar. I do not know what her precise duties were, but she had her own office on the company premises where she worked every day. One of her duties appeared to be soliciting clients and entering into catering contracts on behalf of the company, like a member of the sales team. If we were

preparing food for one of Defendant Bloxton's events, we had take extra care to make sure that everything was done just right.

23. During the time I worked with the company, Defendant Bloxton regularly held events where potential catering clients came to the company's headquarters to try samples of the foods that R&R could prepare for catering events. These samples regularly included cold foods that R&R's cold-kitchen workers, including me, had prepared. I cannot remember precisely how often I saw Defendant Bloxton meeting with clients in this way, but I think it was at least twice a month.

24. R&R calculated its work-week on a Wednesday-to-Tuesday basis. Payday was supposed to be every other Friday. In practice, however, payday was so irregular that I often did not know when I could expect to be paid. I often had to go to the office and ask "Tanya" the accountant if any paychecks had arrived. I sometimes had to wait as long as 22 days or a month between paychecks.

25. I was supposed to receive two "Employee Work Time/Off-Clock Summaries" with each of my paychecks, showing my hours of work each day as recorded by the punch-clock. However, Defendants sometimes failed to give me these summaries, or they would contain errors. Defendants also frequently made handwritten changes to the summaries that reduced my hours. For example, Defendants frequently claimed that I had taken a half-hour off-the-clock break period even where Defendants' own punch-clock showed that I did not take a break that day. Defendants sometimes paid me in one pay period for hours that I had in fact worked in a different pay period. These pay practices made it difficult for me to determine whether I was in fact being properly compensated for the work I was doing.

26. Even on the days when I received a paycheck, there was no guarantee that I would be able to cash it. At times, Tanya would give me my check, but with the caveat that I could not cash it until sometime the following week.

27. I believe that my paychecks regularly failed to compensate me for all of the regular and overtime hours that I worked in a given pay period, whether on the clock or off the clock.

28. Defendants regularly failed to pay me any wages for the work I performed at R&R. Sometimes my paychecks were missing hours. Other times, Defendants simply failed to pay me any wages at all for the work I performed, in amounts ranging from isolated days to entire weeks.

29. I was not paid for the hundreds of hours of work I performed from March 7–April 22, 2014; November 19, 2014–January 13, 2015; or from November 4, 2015–December 1, 2015. I was also not paid any wages for various days and hours I worked outside of these periods.

30. Defendant Chavez regularly required me to work off-the-clock during my half-hour lunch break. This occurred approximately two days each week, often on the weekends.

31. I also understand that Defendants calculated my weekly hours incorrectly, by treating certain minutes that I worked as constituting mere 1/100ths of an hour, rather than 1/60ths. Defendants usually (but not always) gave me two "Work Time/Off-Clock Summaries" with each paycheck, showing my clock-in and clock-out time each week as recorded by the punch-clock. Handwritten notes on these Summaries reveal Defendants' incorrect calculations. For example, during the week of June 17–23, 2015, Defendants' Summary shows me as having worked 62 hours and 42 minutes. During the second week of that pay period, June 24–June 30, 2015, the Summary shows me having worked 51 hours and 32 minutes. I suspect that Defendants simply added up 62:42 and 51:32 and found that I had

worked 113 hours and "74 minutes." An hour has sixty minutes, so 74 minutes is 1.23 hours: by Defendants' own reckoning, then, I should have been paid for 114.23 hours. But Defendants'' handwritten notes show that they incorrectly treated these 74 minutes as 0.74 *hours*—i.e. mere 1/100ths of an hour. And so I was compensated for only 113.74 hours in that pay period.

32. The paystub from that week confirmed that Defendants' handwritten errors were in fact carried over into my take-home pay.

33. I believe that this violation occurred in every pay period during my employment, or at least more often than not.

34. My co-worker—Plaintiff Elida Rivas—and I would complain to R&R personnel about our pay problems, often complaining first to Defendant Chavez because he spoke both Spanish and English. Our native language is Spanish.

35. When we noticed that my checks were missing hours, Plaintiff Rivas and I would usually complain to Defendant Chavez or accountant Michelle Kalski. Defendant Chavez and Ms. Kalski would tell us that they would add these unpaid hours to our next paychecks, but this would not actually happen. Defendant Chavez also said that he would call Defendant Michelle Bloxton about the problem, but I do not know if he did—in any case, it did not fix the problem of my missing hours.

36. On those occasions when we did not receive a paycheck at all, Plaintiff Rivas and I would also complain to Tanya in the administrative office. Tanya would say that the company did not have the money to pay our wages right now.

37. On at least two occasions, Plaintiff Rivas and I stopped working at R&R for a few days because we were frustrated by the company's constant pay problems.

7

38. On or about January 23, 2015, after having received no pay for half of November, all of December, and half of January, Plaintiff Rivas and I told Defendant Chavez that we intended to quit, and we stopped working at R&R. By this time, we were the only experienced cold-kitchen workers left at R&R.

39. Shortly after Plaintiff Rivas and I stopped working, Defendant Robert Saldivar held a meeting with us, either in the cold kitchen or in an adjacent part of the building that housed a Mexican restaurant called "Poncho's," another of Defendants' business ventures. A worker named "Haydee" served as a translator at this meeting. Defendant Saldivar asked us not to quit and told us that we would be paid our back wages.

40. On or around January 26, 2015, Defendant Michelle Bloxton sent me a text message urging me to come back to work, and both Plaintiff Rivas and I did so.

41. On or around January 27, 2015, Plaintiff Gutierrez and I met with Defendants Michelle Bloxton and Manuel Chavez in Defendant Chavez's office. Defendants gave me a check for $1,500, drawn on the account of "StadiYum Cuisine, LLC."

42. On or around February 11, 2015, Plaintiff Gutierrez and I again met with Defendants Bloxton and Chavez in Defendant Chavez's office. Defendants paid me $1,000 in cash.

43. On or around February 15, 2015, Plaintiff Gutierrez and I again met with Defendants Michelle Bloxton and Manuel Chavez in Defendant Chavez's office. Defendants paid me $750 in cash.

44. I understood that three payments were meant to represent part of my back wages and were intended to induce me not to quit.

45. Some time after I received this second cash payment, I was told to come to accountant Michelle Kalski's office. Ms. Kalski gave me a handwritten statement of the unpaid wages

that Defendants admitted they owed me. A true and correct copy of this statement is attached as Exhibit C-1.

46. Exhibit C-1 stated that I had been owed $4,231.32 in unpaid wages, that Defendants had made the three payments totaling $3,250 as described above, and that I was still owed $981.32 in back wages.

47. I believe that Exhibit C-1 was incorrect and significantly understated my unpaid wages.

48. I continued to work at R&R, Defendants' pay violations also continued, and I continued to accrue unpaid wages.

49. By July 2015, my back wages were still due and owing. In mid-July 2015, Plaintiff Rivas and I again told Defendant Manuel Chavez that we intended to quit due to the pay problems at R&R.

50. Once again, shortly after Plaintiff Rivas and I threatened to quit. Defendant Robert Saldivar met with us at the worksite, asked us not to quit, and told us that we would be paid our back wages.

51. On July 17, 2015, Plaintiff Rivas and I stopped working at R&R. This left Defendants without any experienced cold-kitchen workers.

52. Shortly after Plaintiff Rivas and I stopped working, Defendant Chavez called me and urged me to come back to R&R, which I did on or around July 24, 2015. My co-worker, Plaintiff Rivas, did not to come back to R&R.

53. On or around July 28, 2015, accountant Michelle Kalski sent me an email stating that I was owed $5,867.70 in unpaid wages: $2,750.11 in regular wages, $2,136.27 in overtime wages, and $981.32 in wages that were not labeled as regular or overtime. The email did not indicate the date or dates that these unpaid wages were accrued, and it was unaccompanied by any

Employee Work Time/Off-Clock Summaries. A true and correct copy of this email is attached as Exhibit C-2.

54. I believe that Exhibit C-2 was incorrect and significantly understated my unpaid wages.

55. After I returned to work, R&R hired three new workers to work in the cold kitchen. and As I was now the only experienced cold-kitchen worker at R&R, it fell to me to show them the ropes. I had no conversation with R&R management about this, and I received no extra compensation for her work; I simply did it out of necessity. I did not hire these three workers, set their schedules, establish their pay rates, and could not fire or otherwise discipline them.

56. I continued to work at R&R through the beginning of December 2015. The pay problems continued unabated. On or about December 4, 2015, I told Defendant Chavez that I was at the point of leaving. Defendant Chavez urged me not to leave. He said that he would suggest to the office staff that they could pay me my back wages incrementally in each of my next several paychecks. Defendant Chavez said that if I left, he doubted that I would get paid any of my back wages at all. He told me not to bother suing for my back wages, because many people had sued the company, and nothing would happen.

57. My last day at R&R was December 4, 2015.

58. On or around December 23, 2015, the company gave me a check for $981.32. The check stub showed that the wages from this check were meant to compensate me for work I had performed from April 23–May 6, 2014—over a year-and-a-half earlier—and that Defendants had again calculated the overtime incorrectly.

59. In or around February 2016, I received two additional checks: one for $351.78 and one for $876.81. These checks fail to cover the balance of my back wages.

60. My unpaid wages are still due and owing.

61. The spreadsheet attached as Exhibit B-3 accurately reflects the hours I worked and the wages I was paid, to the best of my recollection.

62. During the time that I was working for R&R, I did not have other employment.


I declare under penalty of perjury that the foregoing is true and correct.


//s// Delia Gutierrez                                                            Date: July 8, 2016
    Delia Gutierrez

## INTERPRETER'S CERTIFICATION

I, Nicholas Cooper Marritz, certify that I am fluent in English and Spanish, and that I interpreted the foregoing Declaration of Delia Gutierrez to the declarant faithfully and accurately, to the best of my ability.

_____         July 8, 2016
Nicholas Marritz
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike, Suite 520
Falls Church, VA 22041
Tel: 703-778-3450
Fax: 703-778-3454
Email: nicholas@justice4all.org